# IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

**CEONNI DUNN**                                           :                                    RS
*On her own behalf and on behalf of a*
*class of similarly situated persons*     :
3009 Liberty Parkway
Dundalk, MD 21222                          :

    *Plaintiff,*                        :          Case No.   C-16-CV-25-002472

v.                                                   :          **JURY TRIAL DEMAND**

**SIX FLAGS AMERICA, LP**               :
13710 Central Avenue
Bowie, MD 20721                             :

    ***Serve upon***:                 :
CSC-Lawyers Incorporating Service Co.
7 St. Paul Street, Suite 820               :
Baltimore, MD 21202
                                                     :

and                                                :

**INTERNATIONAL BOARD OF**          :
**CREDENTIALING AND CONTINUING**
**EDUCATION STANDARDS, LLC**        :
542201 Lem Turner Road
Callahan, FL 32011                          :

                                                     :

    ***Serve upon***:
Myron W. Pincomb, Resident Agent
542202 Lem Turner Road                  :
Callahan, FL 32011                          :

    *Defendants.*                      :

---

## CLASS ACTION COMPLAINT AND REQUEST FOR PERMANENT INJUNCTIVE RELIEF

    Ceonni Dunn ("Class Plaintiff Dunn"), on behalf of herself and on behalf of an entire

class of persons similarly situated ("the Class"), by and through her attorneys Clifford J. Boan

and the law firm of Goitein Rosa, LLC, and pursuant to Prince George's County Code §§ 2-200,

1

*et seq.* ("the Code"), and brings this Class Action Complaint against Defendant Six Flags America, LP ("Six Flags America") and the International Board of Credentialing and Continuing Education Standards, LLC ("IBCCES"), for their individual and joint discriminatory and negligent acts pertaining to a place of public accommodation in Prince George's County, Maryland.

<u>INTRODUCTION</u>

On June 7, 2024, Class Plaintiff Dunn was ejected from Six Flags America because she was accompanied in the park by her service animal, a panic attack alert dog. Class Plaintiff Dunn's ejectment from the park, which is a place of public accommodation, was based upon Six Flags' policy that requires disabled patrons in need of reasonable disability accommodations to first submit an application for accommodation pre-approval to a private, for-profit, third-party disability gatekeeper—IBCCES. That application process is intended to screen disabled would-be park goers for proof and confirmation of their disability, followed by IBCCES approval for the disabled person to then request (at the park on the day of the visit) a reasonable disability accommodation from Six Flags America. The IBCCES application requires that the applicants provide details regarding their disability, the nature of the disability's limitations, their treating healthcare providers' names and contact information, and supporting medical documentation.

IBCCES and Six Flags America also impose a time requirement on disabled persons. To be eligible to request a disability accommodation on the day of their park visit, disabled persons seeking an accommodation must submit an application to IBCCES more than 48 hours in advance of that park visit. After submitting all required information, if and when a disabled person is approved by IBCCES, they can still be refused a reasonable accommodation by Six Flags America, in Six Flags America's "sole discretion." Six Flags America's staff inside the

park may also deny or revoke a reasonable disability accommodation based upon those staff members' subjective belief (based upon their personal observations of the disabled person's appearance) as to whether a person is in fact disabled and entitled to the requested accommodation.

In the alternative, Six Flags America's staff are improperly and negligently informed and trained on the IBCCES and Six Flags America disability policies, thus resulting in the wrongful ejectment of disabled persons in violation of Defendants' policies. Thus, the individual and joint acts of Six Flags America and IBCCES are either discriminatory in policy and as applied to Class Plaintiff Dunn, or the Defendants are negligent in their implementation of lawful policies.

This class action is therefore filed pursuant to Rule 2-231 to end continuous, ongoing, systematic, unlawful discrimination or negligent practices engaged in by Defendant Six Flags America and Defendant IBCCES against persons with disabilities.

## THE INDIVIDUAL CLASS PLAINTIFF

1.      Class Plaintiff Dunn is a resident of Dundalk, Maryland, residing at 3009 Liberty Parkway, Dundalk, Maryland 21222. She is 20 years old and a full-time student, studying veterinary science at Hampshire College. Class Plaintiff Dunn is disabled as that term is defined by Prince George's County Code § 2-200, *et seq*. Specifically, Class Plaintiff Dunn has a formal diagnosis of and documented long-term treatment for severe generalized anxiety disorder, associated compulsions, and debilitating panic attacks.

## THE DEFENDANTS

2.      Six Flags America is an ongoing concern engaged in the business of owning and operating an amusement park and entertainment venue that is open to the public in Prince

George's County, located at 13710 Central Avenue, Bowie, MD. That address is also where Six Flags America maintains its principal place of business.

3.       Six Flags America is a place of public accommodation as defined by the Code. Six Flags America's park is open to the public, sells food and alcoholic beverages for consumption on the premises, and is a place of exhibition and entertainment at which patrons may ride attractions, attend performances, and play games.

4.       As a place of public accommodation, under the Code Six Flags America is prohibited from acting on the basis of age, physical impairment, or mental impairment against any person in such a way as to adversely affect that person's access to the advantages, facilities, or privileges offered by Six Flags America at its public park. Six Flags America is also prohibited from denying service to any person on the basis of that person's age, physical impairment, or mental impairment. Any such acts constitute discriminatory conduct under the Code.

5.       IBCCES is a going concern engaged in the business of, among other things, acting as a third-party administrator for disability screening and accommodation pre-approval programs for amusement parks throughout North America. IBCCES is domiciled in Florida and maintains its principal place of business at 54220 Lem Turner Road, Callahan, FL 32011. IBCCES collects applications remotely via the internet for purposes of screening and approving the requests for reasonable accommodations of disabled would-be patrons of Six Flags America's amusement park in Prince George's County. IBCCES also engages in education, training, and credentialing of Six Flags America as a business entity, generally, and Six Flags America's in-park staff specifically, all of which are located in Prince George's County.

6.      As a private, for-profit business, IBCCES advertises itself as the "global leader in professional autism & neurodiversity training and certification." IBCCES provides services to businesses across a spectrum of fields, including education, healthcare, public safety, and employment, as well as amusement parks and other places of public accommodation. According to its website, IBCCES provides online disability, inclusion, and accessibility training to Six Flags America as well as operators of other places of public accommodation throughout North America and beyond.

7.      Such training for operators of places of public accommodation culminates in an IBCCES certification. The process from an amusement park operator's interest in disability inclusion training to actual certification involves an operator of a place of public accommodation: (a) signing up online for IBCCES training (completing an application); (b) attending an online training; (c) taking a certification exam; and (d) obtaining a purported "board approval" from IBCCES's board.

8.      IBCCES advertises to its potential amusement park operator clients that receiving an IBCCES certification will provide (or has provided) benefits including: (a) "increase[ing] market share"; (b) generating "millions of web hits" for operators; (c) "triple-digit increase[s] in out-of-market guests"; and (d) increase[ing] "group bookings" by 54%. IBCCES gives short shrift to the benefit its credentialing and screening services provide to disability patrons of IBCCES's clients.

9.      IBCCES's purported certifications carry no legal mandate from any governmental entity, IBCCES's practices are not subjected to any governmental oversight, and IBCCES's certifications have no basis or authority in law. IBCCES's certification is thus unnecessary for a place of public accommodation to meet its obligations to refrain from discriminatory practices.

10.    Nevertheless, IBCCES's purported certification provides places of public accommodation with a false and baseless sense of propriety in what are, under law, discriminatory policies and acts. For example, places of public accommodation, like Six Flags America, are incentivized and emboldened by their IBCCES certification to believe that their discriminatory practices and discriminatory policies are lawful and inclusive when they are exclusionary and improper barriers to entry. IBCCES certification also acts as a putative paper shield for places of public accommodation against legitimate complaints of discriminatory practices.

11.    The Attraction Access Program is one such exclusionary and improper program that establishes a barrier to entry which has contemporaneously become a public relations benefit and discriminatory policy and practice of Six Flags America.

THE ATTRACTION ACCESS PROGRAM

12.    The Attraction Access Program was created, and is administered, by IBCCES.

13.    Since 2020, Six Flags America has required disabled persons seeking a reasonable disability accommodation in its park to participate in what it calls the "Attraction Access Program" ("the Program").

14.    The Program is a pre-screening, pre-approval, gatekeeping process that Six Flags America requires as a matter of policy and practice before it will consider granting any disabled persons reasonable accommodations within its park.

15.    Six Flags America outsources the implementation of the Program to IBCCES, which created the Program.

16.     Having no government mandate, and having no basis in any statute, regulation, or other law, the Program is an illusory, *ipse dixit*, profit-generating pre-requisite established by IBCCES against persons wishing to obtain any disability accommodation from Six Flags America.

17.     Through the IBCCES, the Program requires persons seeking a disability accommodation to meet certain disability eligibility criteria.

18.     To meet those disability eligibility criteria, the Program application process requires applicants to submit their private, confidential, and sometimes privileged medical and mental health information to IBCCES. Such information includes a disabled applicants name, home address, email address, and disability—for example: needing a wheelchair, having difficulty hearing, having difficulty standing in line, or having sensitivity to crowds. Applicants are required to provide the names of their physicians or behavioral health care providers as well as the contact information of those providers. As support for this information, applicants must also submit medical or mental health records on providers' official letterhead to the IBCCES for review. Applicants are also asked to state how they heard of the Program and to select the amusement park they intend to visit within the next 12 months from among the 29 listed location options. Applicants are also required to submit a photo of themselves.

19.     The Program also has a strict time requirement. Disabled applicants must submit their applications more than 48 hours prior to their park visit. After submission of their application, applicants must be approved by IBCCES and IBCCES Attraction Access Card ("IAC") before they are *permitted* to seek reasonable accommodations at Six Flags America's physical location.

20.     If and when a person's disability pre-screening application is approved by IBCCES, IBCCES issues an IAC to the applicant.

21.    On its website, IBCCES states that an IAC is for "anyone who is requesting accommodations – including but not limited to individuals who are autistic, use a wheelchair, are blind/low vision, deaf/hard of hearing, have mobility support needs, are accompanied by a service animal, have sensory sensitivities, cognitive disabilities, or have other needs and concerns."

22.    IBCCES states that the application is free to applicants, and all such information is purported to be reviewed and verified by IBCCES.

23.    Upon information and belief, IBCCES is compensated by Six Flags America for administering the Program and the IAC application process.

24.    Upon information and belief, if a person's application is denied, there is no formal process for independent review or appeal of IBCCES's decision.

25.    IBCCES states that the IAC is "meant to be accessed and completed prior to the onsite visit to parks, [ ] to empower staff at attractions to better (and more quickly) serve guests requiring additional support on-site, as well as ease the process for guests who need accommodations but are eager to enjoy their time at the park."

26.    Despite that statement, and despite IAC applicants being required to submit personal, confidential, and often privileged medical and behavioral health information before receiving IAC approval from IBCCES, IBCCES is unequivocal that an IAC "does NOT guarantee entry to an attraction and any special accommodations or benefits provided are at the sole discretion of that attraction." (capitalization in original).

27.    In addition, despite IBCCES stating that the IAC is a "free resource," once an applicant advances to webpage three (3) of the application, IBCCES states that, "there may also be an additional charge for these services." Information regarding neither the dollar amount of the potential additional charges nor who charges and collects such amounts is provided.

28.      IBCCES further advises applicants, also three (3) pages into the online application process: (a) that the IAC is "only **notice of a disability** and/or special needs based on the information the parent or guardian provides IBCCES;" (b) that the IAC "can only be accepted at a Facility that is participating in the IAC program and in good standing with IBCCES;" and (c) that an individual public amusement park may (the issuance of an IAC notwithstanding) "require additional information from [applicants] in order **to substantiate the disability or special need.**" (all emphasis added).

<u>IAC AS SOLELY A PUBLIC RELATIONS GESTURE</u>

29.      Six Flags America's discriminatory disability screening process is touted as beneficial by IBCCES and viewed as beneficial by Six Flags America's public relations department. When Six Flags America obtained its IBCCES certification, Six Flags America issued a press release advertising its first-in-the-area IBCCES certification status. Six Flags America referred to itself in that release as, "proud to be a leader in offering more ways for families in the DMV to create memorable experiences. . .[w]ith enhanced training, our all-new ride safety harness system and new sensory-sensitive operating days, more families will be able to enjoy the park in new, better ways than ever before."

30.      Six Flags America further advertised that because of its IBCCES training and certification, it would be able to provide guests with autism and other disabilities: "(a) [tr]ained, helpful, front-line team members equipped to help autistic guests and those with sensory sensitivities to help them enjoy their time at the park; (b) [a] sensory guide for every attraction that provides information into how the attraction or ride may be affected by each of the five senses to make it easier for individuals and families to plan activities that align with their needs; (c) [l]ow sensory areas to allow guests with sensory sensitivities to take a break in a less

stimulating environment; (d) that [a]n updated Accessibility Guide would be available online and at the Guest Services area; and (e) a park-wide IBCCES Accessibility Card program, which Six Flags America described as a free online program with mobile app options for guests to use when requesting help at Six Flags America's park.

31.     Despite Six Flags America's statements that the Program and IAC would make park patronage easier for disabled park visitors, the IAC and its associated proof of disability prerequisites are merely a *necessary* hurdle to be overcome by disabled persons wishing to request an accommodation. An applicant's *mere* approval through the Program and receipt of an IAC are, however, *insufficient* to receive an accommodation.

32.     According to IBCCES, Six Flags America's park administration and in-park staff ultimately have the sole "discretion" whether or not to grant a disabled person a requested accommodation, even if such persons have been approved for and received an IAC.

33.     Despite thus being essentially meaningless, the IAC card issued by IBCCES purportedly, according to IBCCES, creates a "legal contract" between IBCCES and the applicant. The terms by which either IBCCES or the applicants are bound purportedly pertain *only* to exculpating IBCCES from liability despite—since the IAC offers no definite benefits and carries no independent authority under any law—the contract's illusory nature.

34.     In addition, the IAC application and so-called "legal contract" purport to permit IBCCES to collect information from applicants while providing neither any definite benefit nor any recourse to any applicants in the event of IBCCES's improper use of the sensitive personal, confidential, and privileged information IBCCES demands for its discriminatory Program.

35.     IBCCES falsely purports to review and validate information provided by applicants. After submission of all requested information, however, applicants are directed

immediately to a page on IBCCES's website that contains a link for the applicant to download a newly issued IAC.

36.    On that immediately issued IAC, several "Important Information" bullet points are provided. They include, among other things, the following conditions: (a) that the purpose of the IAC is to "pre-register [an applicant] as an individual who ***may need*** accommodations (emphasis added); (b) that the IAC "does not guarantee any benefits or accommodations" because such accommodations are "at the sole discretion of the attraction;" and (c) that the IAC must be presented at the Guest Services desk of Six Flags America upon an applicant's arrival "for details about what accommodations may be available."

<u>IN-PARK IMPLEMENTATION OF THE PROGRAM</u>

37.    If a disabled would-be Six Flags America patron timely applies for an IAC, submits the required medical and mental health information and documentary support, and is "approved" by IBCCES, the approved applicant is then permitted to take the IAC to Guest Services at Six Flags America where the IAC must be presented to a Six Flags America representative.

38.    Presentation of the IAC to Guest Services must be done immediately upon arrival at the park.

39.    At Guest Services, the IAC holder is then permitted to request an accommodation from the Six Flags America Guest Services representative.

40.    Upon receiving a request from an IAC holder, the Guest Services representative will then inform the IAC holder whether or not any accommodations are available, what those accommodations are, and, if applicable, when those accommodations may be accessed. For example, time restrictions and boarding times may be provided for IAC holders who are unable

to stand for long periods of time or have a sensitivity to large, close crowds but who nevertheless wish to ride a park attraction.

41.    Upon information and belief, park staff who are purportedly trained by IBCCES and Six Flags America in communicating and assisting park patrons with neurodiverse, cognitive, emotional, or physical impairments are empowered to review the IAC and requested accommodation, and determine on an *ad hoc*, subjective basis whether the person is entitled to the accommodation he or she seeks.

42.    So empowered, or negligently trained and thus unaware that they are not so empowered, park staff deny accommodations that should be permitted to persons who have obtained an IAC under the discriminatory Program and to persons who are entitled to an accommodation but have not obtained an IAC through the unlawful and discriminatory Program.

<u>NON-DISCRIMINATORY DISABILITY ACCOMODATION PROGRAMS OF OTHER LARGE AMUSEMENT PARKS</u>

43.    Because of its discriminatory and unlawful nature, such major amusement parks as Disney World, Disney Land, and Universal Studios have abandoned the IAC Program, or similar discriminatory programs, in favor of non-discriminatory, inclusive, and lawful disability accommodation programs.

44.    Non-discriminatory accommodation programs, such as those at Disney and Universal, are programs that evaluate accommodation requests immediately, in-person, and without requiring documentary support. In addition, non-discriminatory accommodation programs do not require the presentation of proof of a disability or any pre-approval, pre-screening, or pre-visit registration. Such programs do not employ the use of third-party, for-profit accommodation gatekeepers. Under a non-discriminatory accommodation program, trained in-park staff are permitted to grant accommodations on an *ad hoc*, individualized basis based upon

their observation of park patrons; trained staff are not, however, permitted to challenge a park patron's representation of having a disability that necessitates a reasonable accommodation. Finally, a non-discriminatory accommodation program is one that is clear as to its terms, and compliant with those terms in its application due to the competent, non-negligent training of park staff.

45.    Six Flags America's Program, its reliance on the IAC, and IBCCES as third-party fail to exhibit of the features of a non-discriminatory disability accommodation program.

46.    The acts of Six Flags America and IBCCES with respect to gatekeeping, screening, and approving or denying requested accommodations as a matter of policy and on an *ad hoc*, basis constitute discrimination. The Program, the IAC, and the implantation by park staff of the Defendants' disability policies creates a differentiation in the ability of disabled persons and non-disabled persons ability to similarly enjoy the services, privileges, use, enjoyment, and accommodations of the park. Non-disabled persons are neither required to apply for entry to the park prior to visiting the park, are not required to submit documentation showing entitlement to entry to the park, have no time advance time requirement by which they must decide whether they wish to visit the park, nor do they have their entry to the park or enjoyment of any portion thereof conditioned on any external vetting and gatekeeping process.

<u>THE CLASS</u>

47.    Member of the Class are: (1) all persons who applied for an IAC with respect to Six Flags America between May 7, 2022, and the present, whether they were approved or denied for the IAC; (2) all persons who were denied a reasonable accommodation at Six Flags America by Guest Services at the park because they had not timely obtained an IAC prior to arrival; (3) all persons who were denied a reasonable accommodation by Six Flags America's in-park staff

because such persons did not have an IAC; and (4) all persons who were denied a reasonable accommodation by Six Flags America's Guest Services or in-park staff because such persons, whether or not they had an IAC, did not appear to in-park staff to have a disability that would entitle such persons to an accommodation.

48.     This action is appropriate for class certification because it meets the class action requirements of numerosity, commonality, typicality, and adequacy.

49.     *Numerosity.* The members of the Class are so numerous that their joinder is impractical. Upon information and belief, approximately 1,300,000 patrons visit Six Flags America each calendar year. According to the Maryland Department of Planning, as of a 2023 report approximately 11.6% of all Marylanders live with a diagnosed disability and approximately 11.1% of all Prince George's County residents live with a disability. The Maryland Department of Health estimates that one in five Maryland adults has one or more disabilities, including (a) cognitive disabilities; (b) mobility disabilities; (c) vision disabilities; (d) hearing disabilities; (e) self-care disability; and (f) independent living disabilities. Based upon and extrapolating from those government estimates, upon information and belief, as many as approximately 390,000 disabled persons have visited or attempted to visit Six Flags America since May 7, 2022. Those approximately 390,000 persons are members of the Class. Each time any such disabled Maryland resident wishes to visit Six Flags America's Bowie location, such persons are unlawfully denied equal access to the park as non-disabled persons based upon IBCCES and Six Flags America's IAC Program.

50.     *Commonality.* There are significant questions of law and fact in this action that are common to the Class: specifically, (a) whether the Attraction Access Program is discriminatory as that term is defined by Prince George's County Code §§ 2-186 and §2-200, *et seq*; (b) whether

the IAC application and screening process is discriminatory under the Prince George's County Code; (c) whether Six Flags America's retained discretion to deny disability accommodations under both the Attraction Access Program and the IAC is discriminatory under the Prince George's County Code; (d) whether requiring disabled guests to check in with Guest Services to determine whether and to what extent disability accommodations may be available is discriminatory; and (e) whether Six Flags America's in-park staff exercising their personal discretion to deny accommodations to disabled park patrons—based upon an improperly discriminatory policy or upon Six Flags America's failure to properly train its employees on how to avoid discriminating against disabled patrons in the park—is discriminatory, negligent, or both.

51.     *Typicality.* The claims of Class Plaintiff Dunn as a representative party are typical of and similar to the claims of all members of the Class. Class Plaintiff Dunn is disabled with a mental impairment that, without the assistance of a service animal, materially impacts her day-to-day activities. Class Plaintiff Dunn has a well-established, continuous record of professional behavioral health treatment for her disability. Class Plaintiff Dunn's experience of discrimination at Six Flags America encompasses the full range of discriminatory behavior this Class Action seeks to address. **First**, Class Plaintiff Dunn was expelled from Six Flags America's park because she was accompanied in the park by her service animal, which is trained to alert Class Plaintiff Dunn to debilitating panic attacks (*i.e.*, Six Flags America denied an appropriate disability accommodation). **Second**, prior to her expulsion Class Plaintiff Dunn was questioned exhaustively regarding the nature and extent of her disability (*i.e.*, without justification, Six Flags America challenged and doubted Class Plaintiff Dunn's disability status, even after being provided with disability information from the disabled person). **Third**, despite Six Flags

America's express acknowledgment on its website that service animals are permitted in the park, the in-park staff stated unequivocally to Class Plaintiff Dunn that panic attack dogs are not the "kind of" service animals that are permitted in the park (*i.e.*, the in-park employees exercised their personal discretion in determining whether an appropriate and recognized disability accommodation would be granted to a particular disabled park patron). **Fourth**, Class Plaintiff Dunn was told that based upon her age (*i.e.*, a personal characteristic irrelevant to a person's disability) that she could not possibly have the disabling anxiety and panic attacks for which she was assisted by her service animal (*i.e.*, also an exercise of discretion by an in-park employee based upon personal opinion and observation of an immutable characteristic). **Fourth**, and finally, Class Plaintiff Dunn was told by Six Flags America's employees that, even if all Class Plaintiff Dunn said were true regarding her disability and her service animal, she was nevertheless not permitted an on-site accommodation because she had not obtained an IAC from IBCCES more than 48 hours prior to her visit (*i.e.*, even with a genuine disability and an appropriate, associated accommodation request, disabled persons must plan in advance and share sensitive personal mental health and medical information with a third-party screener and gatekeeper prior to their visit, unlike non-disabled park patrons).

52. *Adequacy of Representation.* As a representative party, Class Plaintiff Dunn will fairly and adequately protect the interests of the Class because her interests in prosecuting this action are aligned with the interests of all other members of the Class. Class Plaintiff Dunn seeks the invalidation of IBCCES and Six Flags America's Attraction Accessibility Program, the IAC, and Six Flags America's in-park policies. She also seeks injunctive and monetary relief for herself and all persons who have been similarly discriminated against by Six Flags America. Class Plaintiff Dunn also seeks monetary damages on behalf of herself and all Class members

16

who were unlawfully treated by in-park staff, in violation of IBCCES and Six Flags America

policies due to negligent training of such staff members by Defendants. Class Plaintiff Dunn's

interest are also fully aligned with all members of the Class because Class Plaintiff Dunn

experienced a full range of discriminatory and negligent conduct across a number of wrongful

and discriminatory acts by IBCCES and Six Flags America. Thus, Class Plaintiff Dunn is

particularly well situated to adequately represent the interests of members of the Class.

<u>MAINTENANCE OF THIS CLASS ACTION</u>

53.    This action is properly maintained as a class action under Rule 2-231(c)(3)

because the questions of law and fact common to the members of the Class predominate over any

questions affecting only individual members of the Class. Therefore, this Class Action is superior

to other available methods available—such as myriad separate lawsuits with inconsistent

resolutions—for achieving the fair and efficient adjudication of the claims and issues in

controversy in this action. While the nature and extent of any one Class member's disability and

experience of discrimination or negligent conduct by Six Flags America and IBCCES may differ

factually from person to person, the primary and overarching questions to be resolved in this

action are those of law; in short, whether the practices of Six Flags  and IBCCES are

discriminatory in requiring generally and in implementing specifically the Attraction Access

Program, the IAC process, and permitting the exercise of discretion by in-park employees as

pertains to denying accommodation sought by disabled patrons at the park.

<u>THE DESIRABILITY OF THE CLASS ACTION</u>

54.    It is desirable and most efficient to adjudicate by class action the claims and

resolve the issues common to all members of the Class raised in this action.

55.     *First*, any interest members of the Class may have in individually controlling the prosecution of separate actions is minimal because on an individual basis the liability, monetary or otherwise, of Six Flags America or IBCCES to any one member of the Class is relatively limited and thus likely to dissuade independent litigation against Defendants by members of the Class.

56.     *Second*, a review of Maryland Case Search and PACER reveal no actions brought against Six Flags America or IBCCES in any Maryland or any federal venue on the claims raised in this action.

57.     *Third*, it is desirable to concentrate litigation of the claims and issues raised in this action in Prince Geroge's County Circuit Court because: (a) Defendant Six Flags America's principal office is in Prince Geroge's County; (b) the place of public accommodation at issue is in Prince George's County, and (c) all members of the Class were discriminated against in Prince George's County by Six Flags America and IBCCES. Therefore, and in addition, upon information and belief, most of the members of the Class, as well as witnesses, for both Plaintiff's witnesses and Defendant's, reside in Prince George's County, Maryland specifically, or the State of Maryland generally.

58.     *Fourth*, it is unlikely that any difficulties will be encountered in the management of this class action. Class Plaintiff Dunn intends to aggressively, vigorously, and expeditiously pursue her interests and the interests of the members of the Class in this action. It is expected that the majority of the members of the Class are local to this jurisdiction, residing in the State of Maryland—including in Prince George's County. In addition, the issues of law in this case are concentrated and concern a discriminatory practice that is uniformly—albeit discriminatorily— applicable, or negligently applied, to all members of the Class.

THE CLAIMS OF CLASS PLAINTIFF DUNN ON BEHALF OF HERSELF

59.     Class Plaintiff Dunn has a history of trauma, anxiety, and panic attacks since childhood. She is currently twenty years of age.

60.     Class Plaintiff Dunn is disabled as defined under the Prince George's County Code § 2-186. She has a well-documented mental impairment that substantially limits one or more of her major life activities. She has a record of such impairment dating back to 2016— when her well-documented treatment for that impairment began. Class Plaintiff Dunn is regarded by her doctors and therapists as having a mental impairment that substantially limits one or more of her major life activities, including generalized anxiety disorder and debilitating panic attacks.

61.     In 2016, Class Plaintiff Dunn was first seen for her mental impairment at the Linden Clinic of the New York Psychotherapy and Counseling Center. There, she was diagnosed with severe anxiety and associated compulsions. Class Plaintiff Dunn was then experiencing increased anxiety, self-isolative behaviors, sporadic bursts of energy, irritability, loss of appetite, some worrying, difficulty concentrating, self-blaming, and some insomnia, as well as shortness of breath, heart palpitations triggered by new experiences, and generalized future-oriented worry. Based upon those symptoms, Class Plaintiff Dunn was diagnosed with generalized anxiety disorder.

62.     One triggering activity of Class Plaintiff Dunn's symptoms was, and continues to be, going to new places and meeting new people.

63.     After her initial diagnosis, Class Plaintiff Dunn continued her professional behavioral health treatment at the New York Interborough Development & Consultation Center. There, her diagnosis of generalized anxiety disorder was confirmed and reiterated.

64. Presently, Class Plaintiff Dunn's behavioral health treatment continues under the ongoing professional care of a therapist at Hampshire College, where Class Plaintiff Dunn attends school and studies veterinary science. That therapist has confirmed and reiterated Class Plaintiff Dunn's generalized anxiety disorder diagnosis.

65. At present, and since her initial diagnosis of generalized anxiety disorder, one of the manifestations of Class Plaintiff Dunn's anxiety is the sudden occurrence of debilitating panic attacks.

66. To mitigate the debilitating nature of those panic attacks, and after consultation with her treating behavioral health care providers, Class Plaintiff Dunn determined that a service dog that could alert her to oncoming panic attacks would benefit Class Plaintiff Dunn by assisting her in managing the effects of her mental impairment without medication, which would be accompanied by side effects.

67. Class Plaintiff Dunn thus sought, obtained, and trained a service dog for that purpose.

68. Class Plaintiff Dunn's service dog meets the criteria to be considered a service animal. Class Plaintiff Dunn's service dog is trained to observe Class Plaintiff Dunn for symptoms of anxiety and oncoming panic attacks. Her service dog is further trained to alert Class Plaintiff Dunn to the potential for an oncoming panic attack. In response to her service dog's alerts, Class Plaintiff Dunn is reminded to pay attention to what she is feeling, experiencing, and thinking; doing so allows her either to prevent the onset of the panic attack, reduce its severity, or take protective measures (such as sitting down) to avoid physical injury in the event the panic attack cannot be stopped, is particularly severe, or causes Class Plaintiff Dunn to lose consciousness.

69.     As such, Class Plaintiff Dunn's service dog is a working dog—trained to perform a distinct task to assist Class Plaintiff Dunn in living with her mental impairment.

70.     Her dog is not a pet.

71.     On June 7, 2024, Class Plaintiff Dunn lawfully entered Six Flags America's park with a valid ticket along with her girlfriend, family, and service dog. Class Plaintiff Dunn's service dog was adorned in a service dog vest, which, although not required, is helpful to notify others of the dog's purpose. Class Plaintiff Dunn and her service dog went through security without incident and were permitted entry into the park.

72.     Class Plaintiff Dunn had not applied for an IAC and therefore did not have an IAC.

73.     At approximately 12:30 p.m. on June 7, 2024, Class Plaintiff Dunn's service dog was sitting in a wagon and attended by Class Plaintiff Dunn's sister while Class Plaintiff Dunn was waiting to ride an attraction.

74.     When Class Plaintiff Dunn returned to her sister's location, representatives of Six Flags America's in-park staff were present.

75.     Those staff representatives extensively and improperly questioned Class Plaintiff Dunn about her disability and her service dog.

76.     Those staff representatives also informed Class Plaintiff Dunn that her service dog was purportedly not permitted in the park.

77.     Class Plaintiff Dunn attempted to inform Six Flags America's staff representatives that her dog was a trained panic attack alert dog.

78.     In response, Six Flags America's staff representatives wrongfully informed Class Plaintiff Dunn that panic attack alert service animals were not allowed in the park.

79.    Contrary to its staff's statements to Class Plaintiff Dunn, Six Flags America explicitly recognizes in a statement on its website that dogs (as well as other animals, including miniature horses) that are trained to calm persons during panic attacks are "working animals, not pets" and are thus permitted in the park.

80.    Six Flags America's in-park representatives also told Class Plaintiff Dunn that she was "too young for a service dog" and by implication too young to be suffering from the mental impairment for which she has been diagnosed and treated since 2016.

81.    Six Flags America's in-park representatives further informed Class Plaintiff Dunn that even if all she said were true regarding her mental impairment and her dog's service animal status, Class Plaintiff Dunn could not request an accommodation onsite. Instead, Six Flags America's staff said, to be permitted to bring her service animal into the park Class Plaintiff Dunn was required to be screened and pre-approved by IBCCES for an IAC no less than 48 hours prior to her visit. Only then would she be permitted, and required, to bring that IAC to Guest Services for service animal approval upon arrival at the park.

82.    Class Plaintiff Dunn was then threatened with criminal trespass by Six Flags America's in-park representatives and directed to select between three options: (1) leave the park immediately with no refund; (2) place the service animal in Ms. Dunn's vehicle parked in Six Flags America' parking lot; or (3) get a rain check. After approximately two hours of discriminatory, humiliating, and improper discussion, Class Plaintiff Dunn, having been presented with three unacceptable choices, left the park while her family stayed at the park.

83.    Six Flags America is responsible for the policies and programs it implements, for the requirements it purports to impose upon its disabled guests, and for the actions, conduct, and statements of its park employees—even when improper, inaccurate, or discriminatory.

84. IBCCES is responsible for implementing and imposing the discriminatory IAC Program followed by Six Flags America, resulting in discriminatory conduct.

85. Six Flags America' ejection of Class Plaintiff Dunn from its park because of Class Plaintiff Dunn's trained service animal accompanying her for purposes of alerting her to panic attacks is an unlawful act of discrimination because that ejectment was based solely on Class Plaintiff Dunn's need for a service animal that assists her with a recognized disability.

86. That ejectment denied Class Plaintiff Dunn the accommodations, advantages, facilities, and privileges enjoyed by others who, not having a mental impairment or other disability, do not require the assistance of a service dog to enjoy Six Flags America's public facilities.

87. The statement of Six Flags America' representative that Class Plaintiff Dunn was "too young" to require the assistance of a service dog was also, and separately, discriminatory because the statement implies that if Class Plaintiff Dunn was older, and therefore "old enough," or otherwise appeared differently, she might then require the assistance of service dog for her mental impairment and only then be permitted to be accompanied by her service animal.

88. According to Six Flags America's park staff, under that theory, were Class Plaintiff Dunn's observable, immutable characteristics different than they were, Class Plaintiff Dunn would not have been ejected from the park because she would have *appeared* to require her service dog, which staff would *then* have permitted.

89. As a result of the discriminatory acts and policies of Six Flags America and IBCCES, or the negligent conduct of Six Flags America's staff, Class Plaintiff Dunn was denied the full facilities, use, accommodations and privileges of Six Flags America's public park; she was embarrassed and humiliated in front of her girlfriend, family, and onlookers present at Six

Flags America's public park; and she was mentally and emotionally negatively impacted by her ejectment from the park.

### COUNT I—VIOLATION OF PRINCE GEORGE'S COUNTY CODE §§ 2-200, *et seq.*
### (Jointly and Severally Against Six Flags America and IBCCES)

90.    The foregoing paragraphs 1 through 89 are incorporated as if fully restated here.

91.    Class Plaintiff Dunn is disabled as defined under the Prince George's County Code.

92.    Class Plaintiff Dunn being accompanied by her service animal at Six Flags America's public park is a reasonable and appropriate disability accommodation.

93.    Class Plaintiff Dunn was denied that reasonable and appropriate disability accommodation, despite her genuine disability.

94.    Class Plaintiff Dunn was informed by Six Flags America in-park staff that, because they believed she did not appear (*i.e.*, was not old enough) to be disabled, she was not entitled to a disability accommodation.

95.    That discretionary decision based upon personal opinion and observations by in-park staff was improper and discriminatory.

96.    Class Plaintiff Dunn was further informed by Six Flags America's staff, either because they were improperly trained or because they were authorized to make discretionary, in-park determinations that service animals such as Class Plaintiff Dunn's were not permitted in the park.

97.    That statement was a false representation of Six Flags America's policy and unlawfully discriminatory against Class Plaintiff Dunn as a person requiring a particular type of disability accommodation.

98.    Class Plaintiff Dunn was further informed that, even if she did have a disability, and even if her service animal was of the kind permitted in the park, no less than 48 hours prior to her visit she first was required to apply and be screened by the IBCCES for an IAC to get pre-approved for her disability before requesting an accommodation.

99.    Six Flags America is vicariously liable for the conduct of its employees within the park.

100.    Had Class Plaintiff Dunn obtained such pre-approval 48 hours prior to her visit, then she would have been permitted—after buying a ticket, traveling to the park, and meeting with a Guest Services representative—to request a disability accommodation. Whether that request might have been granted would have been in the sole and complete discretion of the Six Flags America staff member making the accommodation decision at Guest Services or evaluating Class Plaintiff Dunn inside the park throughout the day.

101.    The requirement that Class Plaintiff Dunn or any person similarly situated be required to apply and be screened for a disability pre-approval by submitting sensitive personal information before requesting a disability accommodation is discriminatory under the Prince George's County Code.

102.    IBCCES and Six Flags America's IAC requirements imposed on persons with disabilities as a prerequisite to seeking reasonable disability accommodations as compared to Six Flags America's treatment of persons who visit the park and do not have a disability constitutes discrimination in violation of Prince George's County Code § 2-200, *et seq.*

103.    By requiring persons with disabilities in need of accommodations to obtain an IAC 48 hours in advance of their visit to the park, disabled persons are stripped of their ability to decide to visit Six Flags America's park spontaneously.

104.     Six Flags America's IAC policy also prevents disabled would-be park goers who comply with the IAC policy from knowing whether, in fact, they will be granted any disability accommodations until they get to the park and speak to Guest Services as to the existence and extent of any available accommodations. Such park-goers are nonetheless still subject to a denial of disability accommodations on a case by case, person by person determination, made in the sole discretion of individual in-park staff members.

105.     Unlike persons who intend to visit Six Flags America' park who are not disabled and can enjoy the park and its attraction as they deem appropriate, at every step of their visit to Six Flags America (from the IAC application process to Guest Services to their time in the park), disabled would-be park goers are denied the same accommodations, advantages, facilities, and privileges afforded by Six Flags America to its non-disabled patrons. Disabled park goers and would-be park goers are faced with *ipse dixit* pre-requisite after pre-requisite before being granted any appropriate disability accommodation; pre-requisites to which non-disabled park goers are not subjected.

106.     Once in the park, even with an IAC and after consulting with Guest Services, disabled guests are nonetheless subject to the evaluative discretion of Six Flags America's in-park staff who are empowered to make, or not sufficiently trained to know they cannot make, subjective determinations as to who is and who is not disabled or entitled to a disability accommodation.

107.     IBCCES is jointly and severally responsible for Six Flags America's discriminatory policies because IBCCES created such policies, assisted Six Flags America in implementing such policies, and trained Six Flags America's staff on carrying out those policies on a day-to-day basis inside the park with park patrons.

26

108.    In discriminating against Class Plaintiff Dunn and all persons similarly situated to her, Six Flags America and IBCCES acted both independently and concurrently, causing the indivisible injury of discriminatory treatment and ultimately denial of access to a place of public accommodation, the use and enjoyment thereof, and associated embarrassment, indignity, and mental and emotional anguish of that discrimination.

WHEREFORE, Class Plaintiff Dunn demands on behalf of herself and all persons similarly situated:

(A)    That the court certify this action as a class action;

(B)    That the court permanently enjoin Defendant Six Flags America and IBCCES from discriminating against Class Plaintiff Dunn and all persons similarly situated by:

   i.    Ceasing to require disabled persons to obtain an IAC prior to visiting Six Flags America's park;

   ii.    Ceasing to require disabled persons to visit Guest Services to determine whether and to what extent Six Flags America will offer reasonable disability accommodations;

   iii.    Ceasing to ask discriminatory questions of patrons who represent that they are disabled, including questions regarding the nature and extent of patrons' disabilities;

   iv.    Ceasing to ask discriminatory questions of disabled patrons concerning the nature and extent of the services provided by their services animals, other than whether an animal is in fact a service animal;

v.      Removing from park employees any discretion they may now have to revoke or limit a disabled person's right to seek or obtain an accommodation to enjoy the park in the same manner as persons without a disability;

(C)    That Class Plaintiff Dunn and all persons similarly situated be awarded compensatory damages against Six Flags America and IBCCES, jointly and severally, in an amount exceeding $75,000.00, plus interest and costs;

(D)    That Six Flags America and IBCCES be ordered to pay all reasonable and necessary attorneys' fees incurred in the prosecution of this action; and

(E)    That Class Plaintiff Dunn and all members of the Class be granted all such further relief as the facts, circumstances, and nature of this action may require.

## COUNT II—NEGLIGENCE
### (Jointly and Severally Against Six Flags America and IBCCES)

109.   In addition, or in the alternative, to Count I the foregoing paragraphs 1 to 89 are incorporated as if fully restated here.

110.   Six Flags America has a publicly advertised policy whereby persons with generalized anxiety disorder and other behavioral health conditions that result in panic attacks are permitted to enter the park and remain in the park with a service animal trained to alert or otherwise assist such persons with their panic attacks.

111.   Six Flags America is aware that such animals are not pets.

112.   Non-disabled persons are not permitted to enter or remain in the park with pets.

113.   IBCCES is a for-profit, private entity that engages in the purported credentialing, certification, and training of places of public accommodation for purposes of creating and implementing non-discriminatory policies and training the staff of such places to lawfully and properly implement and carry out non-discriminatory policies related to persons with

disabilities—including the allowance of reasonable accommodations to such persons in Six Flags America's park.

114.    As such, IBCCES had and continues to have a duty act reasonably and with due care, skill, and diligence in creating policies related to disabled persons and Six Flags America's treatment of such persons in the park.

115.     IBCCES also had and continues to have a duty to act reasonably and with due care, skill, and diligence in training Six Flags America's employees in understanding and implementing non-discriminatory policies with regard to disabled persons inside the park.

116.    Six Flags America also has a duty to act reasonably and with due care, skill, and diligence in adopting policies created and suggested by IBCCES related to Six Flags America's treatment of disabled persons within the park.

117.    Six Flags America has an additional duty to act reasonably and with due care, skill, and diligence in ensuring its staff understand park policies with regard to disabled persons and that its staff are properly trained on the in-park implementation of those policies.

118.    IBCCES breached its duties by either (a) creating policies that resulted in the improper ejection of persons with service animals from Six Flags America's park; (b) failing to train Six Flags America's staff on the proper implementation of policies related to disabled persons with service animals in the park; or (c) both.

119.    Six Flags America also breached its duties by either (a) adopting IBCCES policies that resulted in the improper ejection of persons with service animals from Six Flags America's park; (b) failing to train Six Flags America's staff on the proper implementation of policies related to disabled persons with service animals in the park; (c) both.

120.    Class Plaintiff Dunn and all persons similarly situated are within the category of persons that the duties imposed upon Six Flags America and IBCCES are intended to protect.

121.    IBCCES's primary purpose is to ensure that its clients (including Six Flags America) adopt lawful disability policies and implement such policies appropriately within places of public accommodation to avoid the wrongful treatment of disabled persons.

122.    Six Flags America's primary purpose in adopting and implementing the policies created by IBCCES was to ensure that Six Flags America followed lawful disability policies and that such policies were implemented properly within its park to avoid the wrongful treatment of disabled persons by its staff.

123.    Thus, it was or should have been foreseeable to both IBCCES and Six Flags America that failing to properly train Six Flags America's in-park staff on lawful disability policies and their implementation would result in the wrongful treatment of disabled persons, including wrongfully ejecting such persons.

124.    The failure to properly train Six Flags America's staff did, in fact, result in the wrongful treatment of a disabled person when Class Plaintiff Dunn was wrongfully ejected from the park for being accompanied by her service animal despite Six Flags America's express policy that service animals were permitted in the park.

125.    Upon information and belief, other persons similarly situated to Class Plaintiff Dunn—whether on the basis of the presence of a service animal or other condition—were wrongfully ejected from the park or otherwise denied access to the use and privileges of the park due to the wrongful in-park implementation of Six Flags America's policies regarding disabled persons.

126.    In acting negligently as described in this Count, Six Flags America and IBCCES acted both independently and in concurrently, causing an indivisible injury to Class Plaintiff Dunn and all persons similarly situated by treating them wrongfully in denying them access to the benefits, privileges, use, and enjoyment of the park.

127.    As a result of the independent and concurrent negligence of Six Flags and IBCCES, Class Plaintiff Dunn and all persons similarly situated were injured insofar as they were denied the use, enjoyment, benefits, and privileges of the park, as well as the public and private embarrassment, humiliation, indignity, insult, as well as general mental and emotional distress.

WHEREFORE, Class Plaintiff Dunn demands on behalf of herself and all persons similarly situated:

(F)    That the court certify this action as a class action;

(G)    That Class Plaintiff Dunn and all persons similarly situated be awarded compensatory damages against Six Flags America and IBCCES, jointly and severally, in an amount exceeding $75,000.00, plus interest and costs;

(H)    That Six Flags America and IBCCES be ordered to pay all reasonable and necessary attorneys' fees incurred in the prosecution of this action; and

(I)    That Class Plaintiff Dunn and all members of the Class be granted all such further relief as the facts, circumstances, and nature of this action may require.

Respectfully submitted,


_/s/ Clifford J. Boan_
Clifford J. Boan, Esq. (AIS#1012140066)
4550 Montgomery Ave., Ste 760N

31

Bethesda, MD 20814
(301) 951-1555 (main)
(910) 382-9529 (direct)
(301) 576-5131 (fax)
cliff@goiteinrosa.com
www.goiteinrosa.com



JURY TRIAL DEMAND

On behalf of herself and all persons similarly situated, Class Plaintiff Dunn hereby

demands a trial by jury.


*/s/ Clifford J. Boan*
Clifford J. Boan